[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The court is to decide the custody of Clark Edward Yeargan, born on May 10, 1986 and Jeremy Michael Yeargan, born September 9, 1987. The court heard extended testimony which was competently developed in depth by the three counsel involved in the case. A thorough report was submitted by the Family Relations Office.
The trial of a custody determination is always a very difficult time for the participants. The rendering of a custody determination is always a very difficult time for the court. This is especially so where, as here, the parties are decent people who both love the children very much.
The plaintiff, Kim Yeargen, age twenty-five, is the natural mother of Clark Edward Yeargen and Jeremy Michael Yeargen. Kim claims to be in very good health. Both children are issue of a marriage which is presently the subject of a dissolution action in this court. The children's father has not been seen in a couple of years.
Kim married young. By all accounts, her husband abused her physically and the marriage was a bad one. Kim left her husband about the time she became pregnant with her second child. She became a cocaine abuser during this period though there is conflict about the length of time she used this drug. Separating from her abusive husband, she and her then only child moved in with her parents and brother. She gave birth to her second child while living with her parents. Her dad, with whom she was very close, had cancer. He died of that disease. Kim testified that her dad's death hit her very hard. She felt she was unable to deal with two young children and her dad's death and accordingly decided to move out of her mother's residence leaving her children with her mom. Her CT Page 4065 mother, Janice Williams, and she, agreed that Kim would give legal guardianship of the boys to her mother for one year while Kim attempted to get her life together. Kim's dedication to and involvement with the children during the time of her mother's legal guardianship is the subject of some debate, suffice it to say that her mother seems to have been the primary caretaker during this period.
About mid-way through the year of Janice Williams' guardianship of the boys, the defendants, Alvin Merrick (hereinafter called A.J.) and Joanne Merrick, heard that Alvin's aunt Janice was taking care of two children, Kim's children. Though A.J. and Kim were cousins, they did not know one another personally. Married for some nine years without children of their own, the Merricks further understood that aunt Janice was considering putting Kim's boys up for adoption. Though childless, the defendants had taken care of children during their marriage and were very interested in offering themselves as prospective adoptive parents. The Merricks contacted aunt Janice who was receptive to their involvement. Plans proceeded between the Merricks and Janice Williams concerning the Merrick's possible adoption of the boys.
The defendants testified that they had asked Aunt Janice if Kim knew of the adoption plans and were eventually told that she did. The Merricks were excited about adopting the boys. Kim testified, and the court is inclined to believe her, that her mom, Janice Williams, never told her of the discussions with the Merricks concerning the boys adoption and that the proposed removal of the boys with the Merricks came an unhappy and complete shock. Kim felt that she was not financially and perhaps emotionally ready for the return of the children. The financial argument seems a bit thin. Kim's bills were not extensive and her then salary was comparable to the present time. Her mother gave her an ultimatum, the Merrick's or a foster home. Unrepresented by her own attorney, she went to her mother's attorney who had drawn up papers for termination of her parental rights. The papers were explained to Kim who signed them. The Merrick's testified of speaking with Kim before the Probate Court hearing concerning the termination of Kim's parental rights. They discussed with her whether she understood what she was doing. She appeared to them to understand and agree. In addition, there were discussions with Kim about her future contact with the boys and some of the plans that the Merricks had for them. Jo Merrick testified that she even asked Kim whether she had thought about counseling because of the seriousness of this decision. None of Kim's responses led them to believe that she did not wish to proceed with the CT Page 4066 termination. The termination of parental rights signed by Kim was subsequently granted by the Probate Court in Fairfield.
A couple of days later the plaintiff had a conversation with an attorney she had met through her work and had a change of heart. A new hearing was scheduled in the Fairfield Probate Court. Accompanied by her attorney and with the Merricks and aunt Janice in attendance, the termination of parental rights was withdrawn and temporary custody was given, with Kim's consent, to the Merricks. Although the testimony was somewhat unsettled, it seems the probate judge withdrew the termination of parental rights petition, at least partially, because the adoption by the Merricks coupled with the termination of Kim's rights, would best be carried out in Pennsylvania where the Merricks' lived. After this hearing, the boys returned to Pennsylvania with the Merricks. At this juncture, the court believes that all parties envisioned the Merricks were going to adopt the boys in Pennsylvania and that Kim would be able to and wished to keep contact with them even after the adoption.
The boys seem to have bonded well with the Merricks. Although the court can understand Kim having a disagreement with the Merricks about their addition of Jewish names for the boys, this court is of the opinion that the Merricks did, and continue to do, an excellent job of parenting. As a matter of fact, the Family Relations Officer, Karen Kutno, indicated that she received no criticism of the Merricks' parenting skills from Kim or any of Kim's witnesses. The psychologist's report from Pennsylvania confirmed the positive bonding that has taken place. Kim's contact with the children in Pennsylvania was sporatic and uneven, though she offered the court several explanations for it. However, the evidence would indicate that she did not seem to have been making a concerted effort to see the children, keep telephone or mail contact with them or participate in their birthdays, Christmas, etc. Kim conceded that through January of 1990 she was still expecting her boys to be adopted by the Merricks. At some point soon thereafter, however, she decided she wanted to have her children returned to her. She contacted counsel, and this action for custody was eventually filed. The Merricks were stunned and distressed by Kim's change of position. The boys were an integral part of their lives, and seemingly, by all accounts, were flourishing in their new surroundings.
It should be noted that the Merrick's temporary custody order entered by the Fairfield Probate Court was subsequently vacated by that court. Kim is to be commended for not, exercising any self help that might have been available to her CT Page 4067 during the pendency of this action.
After the commencement of her custody action, Kim started to go to counseling and continues to attend these sessions on, up to the present time, what this court considers to be less than a consistent basis. Although other drug testing proved negative, she has tested positive for the use of marijuana during her counseling.
Visitation between Kim and the children has increased significantly pending and during this trial. The Merricks tell of what they see as a not insignificant deterioration in the behavior of the boys as this contact with Kim has increased.
The Court has great empathy for Janice Williams, Kim's mother. Losing her husband to cancer (who from all accounts seems to have been a person who exerted a strong influence on his family) and then being left Kim's two small children having her own teenage son in the house and holding down a full time job, all at the same time, was a burden that no one should be asked to bear. Some of her decisions during this period might be open to question but again, given the enormous pressure she was under, should not be overly dissected. The trial was also a difficult time for Janice. She likes the Merricks, thinks they have done a credible job, but since late spring or early summer has sided with her daughter who she believes "deserves another chance". If the children are returned to Kim, the three of them will live with Janice and Kim's brother in the Byro Street Fairfield residence.
Kim's immediate superior at her place of employment testified on her behalf. The witness has supervised the plaintiff for over one year. She found Kim to be a conscientious worker who could be counted on. Interestingly, Kim works in a photography studio where much of her work involves interaction with young children such as Clark and Jeremy.
The Court has some ambivalence about Kim's relationship with her fiancee, Robert Miller. Testimony would indicate that the relationship has been somewhat uneven with several starts and stops. However, the uncertainty of Kim's wishes concerning the children in 1989 and the uncertainty of the outcome of Kim's request for custody in 1990 make such starts and stops not too surprising. On balance, the court believes Robert can be a sincere young man with a good trade who has the ability to be, if he puts his mind to it, an asset in Kim's life. CT Page 4068
The interests of Clark and Jeremy were competently represented by counsel appointed by the Court. At the conclusion of the evidence, counsel made no recommendation to the Court as to whether Kim or the Merricks should be granted custody of the boys.
In making a custody determination between a parent and a stranger, i.e. anyone other than a parent, the court finds statutory and case law guidance. Connecticut General Statute46b-56(b) states:
 Presumption re best interest of child to be in custody of parent. In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody.
Franklin v. Dunham, 8 Conn. App. 30 at p. 32 stands for the proposition that in a controversy between a parent and a stranger, the parent has the stronger right to custody unless the child's welfare clearly requires that custody be placed in the stranger.
The statute and case law present a formidable obstacle to the Merricks. In her report, which was buttressed by well reasoned testimony, the Family Relations Officer, Karen Kutno, expressed the opinion that the children should remain with the Merricks with visitation rights being extended to Kim.
Karen Kutno found both "homes" to be adequate but the Merricks' to be superior. By "homes" she meant not only the physical surroundings, but the complete custody package including the emotional surroundings, parenting skills and support system. She expressed substantial concern about the effects on the children of a failed reunion with their natural mother. She further indicated, during her testimony, that she was aware of C.G.S. 46b-56(b) and applicable case law when she made her recommendation. Although Kim's position as a natural mother made this a close case, she felt the Merricks should be granted custody.
Kim's counselor, Cheryl Panosian, was guarded in her opinion concerning Kim. She indicated that Kim had not kept all of her appointments and did not seem, initially, well-focused on what her difficulties were. Ms. Panosian did testify, however, that Kim seemed to be making slow, steady CT Page 4069 progress during her most recent counseling sessions. Kim now gives the appearance of being less self-centered and less defensive about her past decisions. She focuses more on the children. Ms. Panosian expressed some concern about increased tension between Kim and her mom as a result of each hearing the other's testimony in court. Dr. Africano, who is associated with Ms. Panosian, expressed some reservations about Kim, in particular concerning her past drug abuse.
The Court concludes that the boys would continue to prosper with the Merricks. The Court further concludes that Kim has made progress in advancing to the position where she can become, again, the children's primary guardian. Connecticut General Statutes 46b-56(b), relevant case law and the evidence dictate to the court that custody of Jeremy and Clark be granted to Kim Yeargen, their natural mother and it is so ordered. Upon weighing all the evidence this Court can not conclude that it would be detrimental to the children to permit Kim to have custody. See Connecticut General Statutes46b-56(b), nor can the Court conclude that the children's welfare clearly requires that custody be placed with the Merricks. See Franklin v. Dunham, 8 Conn. App. 30.
Kim's custody is to be closely monitored. She is to continue counseling on a consistent basis. Testimony made it clear that there are several areas in which Kim still needs to make real progress. The counseling is to include regular random drug testing. Kim should be clearly warned about the use of marijuana. Her mother has also agreed to participate in counseling and is requested by the court to do so. Kim's counselor, Ms. Panosian will prepare a counseling program for Janice.
This Court sees a continuing active role by the attorney for the minor children. The Court is aware that he invested many hours on this case, far beyond what I am sure he envisioned when he accepted the appointment at low hourly rates, but his continued involvement is crucial. Ms. Panosian is to issue him a report on Kim's progress every six months for the next two years. He is also to monitor the children concerning their possible need for counseling. As attorney for the children, seeking to protect their best interests, he will return the matter to Court at anytime if in his opinion Kim has conducted herself in such a manner that the court's order should be reviewed.
The Court will not order specific periods of visitation for the Merricks at this time. They are entitled to visitation now. If they wish to exercise visitation but are denied from doing so, that should be brought to the court's CT Page 4070 immediate attention. The Court makes no orders, ab initio, in order to allow the Merricks to sort out their own feelings concerning immediate visitation with the boys. The Court is confident they will consider Clark and Jeremy's best interest when making this decision. Having arrived at a decision in this regard, they should first seek to reach agreement with Kim if they wish to have time with Clark and Jeremy. Lacking agreement, the question will be mediated by the Family Relations Office and if there is still no agreement, the matter will be submitted to the Court for resolution. This Court is optimistic that the parties will be able to work out between themselves the specifics of visitation. It should not need inclusion but the Court stresses that all visitation should be conducted by the parties in a manner conducive to the best interests of the boys.
The Court realizes what a stunning emotional setback this decision is for the Merricks. It is probably small consolation for them the remarks the Court directed to Kim at the time of final argument — Namely, that if she were to prevail in this litigation she should also be always grateful to A.J. and Jo for the parenting they have done with her two children for over one year and a quarter. The undisputed fact is that they did a commendable job with the boys. However, the evidence, when applied to the law in this case, persuaded the Court that the boys should be returned to Kim. After the bitter disappointment of this decision has an opportunity to subside, the Court would hope that they consider giving their love and considerable parenting skills to some other children who could greatly benefit from them.
Kim should step back and analyze and resolve clearly to herself that she now wants the return of Clark and Jeremy because it is in their best interest and not her best interest. Clark and Jeremy deserve at least this. The primary residence of these two boys should remain with Kim as long as she is able to make the sacrifices necessary to act consistently in their best interest. Kim may find the task too much. If so, she should, above all, not feel guilty. Everyone has their strengths and weaknesses and this may not be the time in Kim's life when she is able to effectively exercise these strengths. Not only now (as indicated above) but in the future, her decisions must be rooted in the best interest of the children, not in her best interest.
The Court orders that the transfer of Clark and Jeremy to Kim take place December 9, 1990. Kim is to travel to Pennsylvania to pick up the boys unless A.J. and Jo wish to drive the boys to the Byro Street, Fairfield residence. As indicated in Karen Kutno's report, the Byro Street backyard CT Page 4071 will be cleaned and fenced before the boys are returned. The Merricks are also to transfer to Kim any personal belongings of the boys that belonged to them at the time they left Connecticut to reside in Pennsylvania.
The Court further orders that this custody award be effective immediately and not be stayed during the twenty day appeal period nor during any appeal. The Court's authority to enter this order rests upon Yontef v. Yontef, 185 Conn. 275.
Kim has shown progress. The Court expects further continued progress. Her two very special boys deserve nothing less than the very best from her.
HAUSER, JUDGE